FILED
99 MAR -2 PM 2:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **CARRIE WILLIAMS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. CV- 96-B-1519-S |
| ) | |
| **ROCHE BIOMEDICAL,** ) | |
| ) | |
| Defendant. ) | |

ENTERED
MAR 02 1999

## MEMORANDUM OPINION

This matter is before the court on the motion of Laboratory Corporation of America Holdings ("LabCorp"), formerly Roche Biomedical Laboratories, Inc., for summary judgment. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's motion for summary judgment is due to be granted.

This lawsuit arises out of plaintiff's employment at LabCorp. In her complaint, Carrie Williams ("plaintiff") alleges that defendant discriminated against her on account of her race and disability and retaliated against her for filing an EEOC Charge, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17, and 42 U.S.C. § 12101, *et seq.* In response to LabCorp's motion for summary judgment, plaintiff abandoned her race discharge and disability claims. Therefore, the court will only address plaintiff's remaining claims of retaliation and failure to transfer.

1

## FACTUAL SUMMARY

LabCorp performs various types of clinical testing procedures in its laboratories. LabCorp employs service representatives who drive to various laboratories, hospitals, physician offices, and other facilities, to pick up the specimen that LabCorp analyzes and to deliver supplies to those facilities. (Pl.'s Dep. at 22, 26; Trammell Dep. at 12 ). Service representatives cover specific territorial routes and are provided automobiles to carry out their duties. (Pl.'s Dep. at 29-30; Trammell Dep. at 10, 12). First shift service representatives deliver supplies, in addition to picking up specimens. (Pl.'s Dep. at 26-30). Each first shift route also requires the delivery of supplies which weigh more than twenty-pounds. (*Id.*; Trammell Dep. at 17-18). First shift service representatives perform identical duties regardless of their assigned route. Also, their status, pay, work hours, job responsibilities and role at LabCorp remains the same regardless of the assigned route. (Hart Aff. ¶ 4).

LabCorp hired plaintiff as a first shift service representative in 1986. (Pl.'s Dep. at 21). As a service representative, plaintiff performed her duties satisfactorily and did not receive any disciplinary write-ups. In December 1993, plaintiff injured her back. She visited Dr. Cloyd, her treating physician, on December 14, 1993, and December 21, 1993, for treatment. On both occasions, Dr. Cloyd released Williams to return to work with no restrictions. (Pl.'s Dep. at 24, 113-114, Exh. 9 and 10). Dr. Cloyd referred plaintiff to Dr. Donovan Kendrick, an orthopedic specialist, who placed a twenty-pound lifting restriction on plaintiff on December 29, 1993, and sent her to physical therapy in January of 1994. (*Id.* at 115-116; Trammell Dep. Exh 1). On February 21, 1994, Dr. Cloyd released plaintiff to return to work with no restrictions. (Pl.'s Dep. at 118-119, Exh. 11).

After she injured her back, plaintiff asked her supervisor Ernest Trammell to have someone else deliver her paper supplies or to assign her to another route which had less supplies as her assigned route. (Pl.'s Dep. at 27, 31). In her deposition, plaintiff testified that she was referring specifically to Route 3, but that she did not make this known to Trammell. (*Id.* at 32-33). Gary Sanderson was the employee assigned to Route 3 during the relevant period. (*Id.*). Prior to plaintiff's request for a transfer to another route, Trammell reassigned Gary Sanderson, a white part-time service representative, to another route because a conflict with Sanderson's full-time fire-fighter position made him unable to arrive at work at the scheduled time for his assigned route. (*Id.* at 47-48). Also, Trammell granted requests by Vann Shell and Jean Stacey, both white full-time service representatives, to transfer shifts. (*Id.* at 188-189). Finally, LabCorp moved Bill Stewart, a white full-time employee, to a dispatcher position when he lost his driving certification. (*Id.* at 169).

Trammell rejected plaintiff's request to have someone else deliver the paper supplies and advised her to deliver the supplies or to transfer to the second shift, which did not require the delivery of supplies. (Pl.'s Dep. 38). Plaintiff rejected the second shift option and continued to work on her assigned route until March 28, 1994, when she requested to be transferred to the third shift in the Accessioning Department. (*Id.* at 37-38, 42-43, 70). When plaintiff applied for the third shift Accessioning Department position Jacquelyn Coleman, who is African-American and is the third shift supervisor of the Accessioning Department, interviewed and selected plaintiff for the position. (Pl.'s Dep. at 43-44; Coleman Dep. at 70). The Accessioning Department receives specimens from the service representatives, performs preliminary analysis on the specimens, and routes them through LabCorp's system for further analysis. (Coleman Dep. at

3

9).

On April 8, 1994, plaintiff filed an EEOC charge, alleging that Trammell failed to accommodate her lifting restrictions because of her race and in violation of the Americans with Disabilities Act ("ADA"). LabCorp received plaintiff's EEOC charge on April 20, 1994. (LabCorp's Reply Br. Exh. A).

In deposition, Janie Adams, LabCorp's Regional Human Resources Director, could not recall specifically when she received the EEOC charge. However, Adams testified that she received the Charge sometime prior to November 1994, the date she moved to her current office location. (Adams Dep. at 21-22). LabCorp responded to plaintiff' EEOC charge in May 1995. Janie Adams met with Customer Service Department supervisors Jerry Hart and Ernest Trammell to investigate plaintiff's allegations and to ascertain how they accommodated plaintiff's lifting instructions. (Adams Dep. at 23- 24). Adams did not mention the EEOC charge to Jacquelyn Coleman, plaintiff's new supervisor, since it involved a different department and conduct prior to plaintiff transferring to Coleman's department. (Adams Dep. at 24). Also, plaintiff never advised Coleman that she filed an EEOC charge, nor did she have any discussions with Coleman about her EEOC charge in the two years she worked for Coleman. (Pl.'s Dep. at 71-72). Coleman testified that she did not know about the EEOC charge until after she discharged plaintiff on February 28, 1996. (Coleman Dep. at 153-154, 156-157).

Except for some problems in June and July 1994, plaintiff performed satisfactorily in the Accessioning Department until August 1995. (Coleman Dep. at 86, 89-90). On September 12, 1995, Coleman issued plaintiff a reprimand for being "unwilling or unable to consistently meet [the] demands of [her] position and department." (Pl.'s Dep. Exh. 4). Specifically, Coleman cited

4

plaintiff (1) for taking an hour to complete an assignment that should have lasted less than thirty minutes; (2) for claiming that she could not locate an "AFB", that was subsequently located in less than ten minutes by an employee with less than half of plaintiff's tenure in the department; and (3) for failing to pack some frozen specimen for shipping. (*Id.* at Exh. 3). In the reprimand, Coleman wrote that the AFB "test is a life [and] death situation," and that she has worked with plaintiff and "given [her] excessive time to learn what is needed" for the position. (*Id.* at Exh. 3 and 4). Coleman advised plaintiff that she would suspend and/or discharge her if she did not improve her performance. (*Id.* at Exh. 4).

On October 3, 1995, Coleman suspended plaintiff for three days for failing to improve her conduct since the September 12, 1995, reprimand. (*Id.* at Exh. 5). Specifically, Coleman complained that (1) on September 14, 1995, plaintiff could not locate a specimen and she placed the wrong labels on a specimen; (2) on September 27, 1995, plaintiff "poured" and "pulled"[1] a specimen incorrectly; and (3) on October 2, 1995, plaintiff failed to perform her duties properly. (*Id.* at Exh. 6). Coleman placed plaintiff on a Performance Improvement Plan (PIP) when plaintiff returned from suspension. In the PIP, Coleman outlined plaintiff's performance infractions, advised plaintiff to "follow dep[artment] procedures [and] recognize [and] correct her own mistakes before passing them on to fellow [employees]." (*Id.* at Exh. 7). Thereafter, Coleman met with plaintiff on October 16 and 23, 1995, November 6, 14, 21 and 29, 1995, December 5, 1995,[2] January 8 and 17, 1996, and February 14, 1996. (*Id.* at Exh. 8, 12-20). In each of these

---

[1] Pouring and pulling are terms of art used to denote the separation of serum from the cells of a specimen. (Coleman Dep. at 77-78).

[2] Coleman planned to follow-up with plaintiff on December 20, 1995 because plaintiff was on vacation from December 11-15, 1995. (Pl.'s Dep. Exh. 17). However, because of

5

meetings, Coleman reviewed plaintiff's status, advised plaintiff of the problems with her performance,[3] gave plaintiff a chance to respond, gave plaintiff a copy of the PIP, and advised plaintiff that she was subject to discharge if she did not improve her performance. (Pl.'s Dep. at 127-130, 132-140). Coleman counseled plaintiff because she "was concerned about the quality of our specimens which were dropping. We had amniotic fluids that did not exist. We had blood bank specimens that were going out that were improper. Both of these type problems are life or death procedures..." (Coleman Dep. at 162-163). Also, Coleman added that the "problems I was having with [plaintiff] were crucial enough that no employee should have been there. We were talking about life or death situations in the instances that I used PIPs on [plaintiff]." (*Id.* at 43). Coleman testified that her department "never had the quality of [its] work suffer like the quality was slipping" because of plaintiff. (*Id.* at 45-46).

After about seven weeks of the PIP, Coleman spoke to her immediate supervisor Ken Thirkill, and advised him she wanted to discharge plaintiff. (*Id.* at 56). Thirkill advised Coleman to consult with LabCorp's Regional Human Resources Director Janie Adams. (*Id.* at 56). Thereafter, Coleman called Adams and advised Adams that she wanted to discharge plaintiff because of performance problems.[4] (Coleman Dep. at 33). Adams reviewed plaintiff's personnel

---

Coleman's own vacation schedule, she could not meet with plaintiff until January 8, 1996. (Pl.'s Dep. Exh. 18). On January 8, 1996, Coleman cited plaintiff for infractions she committed on December 28, 1995, and January 2, 1996. (Pl.'s Dep. Exh. 18).

[3] Matters discussed included low efficiency, sending out the wrong samples for testing, instability in production and work quality, incorrectly identifying specimen and incorrectly testing specimens. (Pl.'s Dep. Exh. 8, 12-20).

[4] About three weeks earlier, when Coleman requested plaintiff's personnel file from Adams, Adams told Coleman that "the lawyers" had plaintiff's file. (Coleman Dep. at 62).

6

file and advised Coleman that she could not discharge plaintiff at that time. (*Id.* at 30-33; Adams Dep. at 80). Adams wanted to give plaintiff a chance to improve because prior to September 1995, plaintiff was a satisfactory employee. (Adams Dep. at 80, 127-130, 170).

About three or four weeks before plaintiff's discharge, Coleman contacted Adams again about discharging plaintiff. Again, Adams advised her against discharging plaintiff. (Coleman Dep. at 38-39, 60). Sometime thereafter Coleman called Thirkill, and questioned Thirkill on how she was expected to "maintain the quality expected out of medical specimen's [*sic*] with one employee totally disregarding the essence of our work." (*Id.* at 43). Thirkill said he would get back in touch with Coleman with a decision. (*Id.* at 42).

Thirkill called Adams, advised her of the continual problems with plaintiff's performance and, for the first time, informed Adams that Coleman had met with plaintiff on a regular basis and that Coleman had written up the PIPs to document these meetings and plaintiff's infractions. (Adams Dep. at 161-162, 171-172). Adams asked Thirkill to send her these documents which were not in the personnel file she had reviewed. (*Id.* at 162,172). Adams reviewed these documents and because of plaintiff's pending EEOC charge, she sent them to David Gee, LabCorp's in-house counsel. (*Id.* 200-201). After consulting with David Gee, Adams advised Thirkill that it was okay for Coleman to discharge plaintiff. (*Id.* at 157-158). On February 28, 1996, Coleman discharged plaintiff. (Coleman Dep. at 160-161; Pl.'s Dep. Exh. 21). Plaintiff's personnel file stated that plaintiff was involuntarily terminated because she was "unwilling or unable to meet job requirements." (Pl.'s Dep. Exh. 21).

7

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues of material fact exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### RETALIATION CLAIMS

To establish a prima facie case of retaliation, plaintiff must show that (1) she exercised protected rights; (2) that an adverse employment action occurred; and (3) that the adverse action

8

was causally related to her protected activities. *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993) (citation omitted). If plaintiff establishes a prima facie case, the burden shifts to LabCorp to produce a legitimate non-retaliatory reason for the adverse employment decision. *Reichhold Chems.*, 988 F.2d at 1572 (citation omitted). LabCorp's "burden at this stage is relatively light. The defendant need not persuade the court that it was actually motivated by the proferred reasons. . . it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (quoting *Burdine v. Texas Dep't of Community Affairs*, 647 F.2d 513, 254-255 (5th Cir. 1981)). If LabCorp satisfies its burden, plaintiff must ultimately prove that the proffered reasons are a pretext for retaliation. *Reichhold Chems.*, 988 F.2d at 1572. Indeed, even if plaintiff can establish a "causal link" between the protected activity and the adverse action, this simply enables her "to overcome the initial hurdle of having to make a prima facie case of retaliation. It [does] not, however, relieve [plaintiff] of the burden of overcoming any legitimate reasons articulated by [LabCorp]." *Simmons v. Camden Co. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Plaintiff's prima facie case of retaliation fails because she cannot establish that Jacquelyn Coleman, the supervisor who disciplined her and whose recommendation led to her discharge, had knowledge of her EEOC charge. Plaintiff has no credible evidence to refute Adam's testimony that she never mentioned plaintiff's Charge to Coleman. Nor can she refute Coleman's testimony that she first learned about the charge after she discharged plaintiff. (Adams Dep. at 24; Coleman Dep. at 153-154, 156-157). In fact, plaintiff testified that she never mentioned her charge to Coleman and that Coleman never indicated to her that she had knowledge of her charge. (Pl.'s

9

Dep. at 71-72, 149). Given this uncontroverted testimony, plaintiff's attempt to impute knowledge of her EEOC charge to Coleman from Adam's statement to Coleman that "the lawyers" had plaintiff's personnel file falls short.[5] Plaintiff presented no evidence to show that at LabCorp this statement indicates that an employee has filed an EEOC charge. Absent such evidence, this statement is ambiguous, with alternative meanings, and is simply too speculative to draw the inference that it placed Coleman on notice that plaintiff had filed an EEOC charge. Plaintiff's conclusory assertions about Coleman's knowledge "without specific supporting facts have no probative value" and are insufficient to defeat a motion for summary judgment. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Accordingly, plaintiff's prima facie case fails because she cannot "establish that the employer was actually aware of the protected expression at the time it took the adverse action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

Even if plaintiff had evidence that Coleman knew of her EEOC charge, her prima facie case of retaliation would fail because she cannot establish the causal link between the protected activity and the adverse employment action she complains about in this lawsuit. A plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Reichhold Chems.*, 988 F.2d at 1571-1572; *Simmons*, 757 F.2d at 1189. LabCorp received plaintiff's EEOC charge on April 20, 1994. (LabCorp's Reply Br. Exh. A).

---

[5] Plaintiff also seeks to impute knowledge of her charge to Coleman by citing to Trammell's deposition testimony for the proposition that her charge was common knowledge among supervisors. However, Trammell's deposition testimony is clear that he referred specifically to supervisors in the Service Representatives Department. (Trammell Dep. at 25 - 27). Furthermore, Trammell testified that he did not discuss plaintiff's charge with Coleman. (*Id.* at 27).

10

Plaintiff was terminated on February 28, 1996, . . . 23 months after LabCorp received her EEOC charge. Due to the remoteness between the protected activity and the alleged adverse conduct, no reasonable jury could conclude that the adverse action (her termination) was causally related to plaintiff's protected activity (EEOC charge). The disciplinary write-ups that Coleman started issuing in September 1995, are likewise too remote to be related to the EEOC charge. Many courts have held that the remoteness between the protected conduct and the alleged adverse action destroys the necessary causal link. *See, e.g., Krouse v. American Sterilizer*, 126 F.3d 494, 503 (3rd Cir. 1997)("[T]he timing of the allegedly retaliatory employment action [19 months later] cannot, standing alone, support a finding of a causal link.").[6]

The fact that plaintiff worked at LabCorp for 23 months after LabCorp received notice of her charge militates against plaintiff's assertion that LabCorp discharged her in retaliation for filing an EEOC charge. Similarly, the fact that plaintiff did not receive a reprimand until 18 months after her EEOC charge destroys any inference that LabCorp retaliated against her for filing an EEOC charge. Accordingly, plaintiff simply cannot establish a prima facie case of retaliation.

---

[6] Plaintiff asserts that, when considering the issue of remoteness, this court should consider May 1995, when LabCorp responded to the EEOC Charge, and September 1995, when the EEOC mistakenly asked LabCorp to submit its initial response to the Charge as the relevant dates. However, the relevant date is April 20, 1994, the date LabCorp learned about plaintiff's Charge. But, even if the relevant time period is May 1995, or September 1995, plaintiff's causal link still falls short. As noted, plaintiff does not have any evidence to establish that Coleman knew of her EEOC charge. Also, the nine month span between the discharge and LabCorp's response to the Charge and the four month span between the September communication with the EEOC and the discharge destroys the necessary causal link for a prima facie case. *See, e.g., Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (disciplinary letter issued four months after discrimination charge not causally linked); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (discharge four months after filing of discrimination charge not causally linked).

Assuming plaintiff had established a prima facie case, defendant LabCorp has articulated a number of legitimate nondiscriminatory reasons for discharging plaintiff. LabCorp has offered evidence reflecting that plaintiff was counseled repeatedly about various, serious performance infractions and was advised that she would be discharged if her performance did not improve. Despite the repeated counseling and chances to improve, plaintiff continued to have performance problems, which according to her supervisor, affected the integrity of vital testing procedures.

Plaintiff seeks to establish that LabCorp's articulated reason is pretext for retaliation by denying that she engaged in the conduct canvassed by Coleman in the various write-ups that led to her discharge.[7] Unfortunately for plaintiff, whether she engaged in such conduct is irrelevant to the issue of whether LabCorp discharged her for engaging in protected activity. Instead, the inquiry is whether LabCorp acted with a reasonable belief that she committed the infractions at issue and whether it made the discharge decision with a discriminatory motive. *See Jeffries v. Harris County Comm. Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir. 1980) ("[W]hether [employer] was wrong in its determination that [plaintiff] acted in violation of [its] guidelines . . .

---

[7] Plaintiff also seeks to establish pretext by claiming she had a spotless record prior to filing her Charge. This argument fails for several reasons. First, since plaintiff was new to the Accessioning Department, her prior record as a service representative which primarily involved delivering supplies and transporting specimen, is hardly a gauge of whether she can perform effectively the laboratory-like tasks of "pouring", "pulling", "splitting", required in Accessioning. Similarly, that her record was largely free of major performance problems in her first 18 months in Accessioning, a period when LabCorp had notice of her EEOC charge, contradicts her assertion that her EEOC charge caused the disciplinary write-ups beginning in August, 1995, and her subsequent discharge. Instead, the record reflects that after 18 months in Accessioning, plaintiff's supervisor began noting a pattern of problems, including problems in areas that should have been basic and routine at that point because of her tenure. Plaintiff's reprimands stated that plaintiff "should know what type spec[imens] to send for testing at this point [and] time ... [a]fter [1] year of doing this ..." (Pl.'s Dep. Def. Exh. 15). Instead of discharging plaintiff immediately, Coleman and Adams gave her several chances to improve her performance.

is irrelevant . . . [W]here an employer wrongly believes an employee has violated company policy, it does not discriminate in violation of Title VII if it acts on that belief.")(citations omitted and emphasis in original); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977)("Even if [defendant] wrongfully believed that [plaintiff] knowingly violated . . . policy, if defendant acted on this belief it was not guilty of racial discrimination."), *overruled on other grounds, Burdine v. Texas Dep't of Community Affairs*, 647 F.2d 513 (5th Cir. 1981); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)("The question is not whether the employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

LabCorp acted reasonably in its decision to credit Coleman's reports of plaintiff's deficient performance. In response to Coleman's repeated requests to discharge plaintiff, Adams reviewed the write-ups from Coleman's weekly meetings with plaintiff. These write-ups showed unequivocally a pattern of performance problems by plaintiff. According to Coleman, these were serious breaches that could have resulted in the death of the individuals whose specimen plaintiff mishandled. Coleman stated that the "problems [she] was having with [plaintiff] were crucial enough that no employee should have been there." (Coleman Dep. at 43). She further stated that she was "talking about life or death situations in the instances that [she] used PIPs on [plaintiff]." (*Id.*). Adams ascertained from these write-ups the magnitude of plaintiff's infractions and verified from them that despite repeated chances, plaintiff continued to make identical mistakes. Again, "[t]echnically, it is not really relevant whether [the infractions] occurred or not. What *is* important is that [Adams] had reasonable grounds to *believe* that they had occurred." *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1482 (S.D. Fla. 1987) (emphasis in original), *aff'd*, 865

13

F.2d 1272 (11th Cir. 1988); *see also Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir. 1994) ("A strong undercurrent running throughout all of [plaintiff's] argument is her claim of innocence . . . But these challenges do not address the question of law before the court. The question is whether [defendant] could have reasonably believed that [plaintiff] was guilty of the offenses charged.").

Coleman's write-ups, which outlined in extensive detail plaintiff's infractions, lend ample support for LabCorp to reasonably believe that plaintiff committed the offenses at issue. Adams acted reasonably when she credited Coleman's reports of plaintiff's substandard performance and, accordingly, it is simply irrelevant that plaintiff now denies engaging in the conduct at issue. Plaintiff's blanket denial of the conduct at issue falls short in establishing that LabCorp's articulated reason is a pretext for retaliation. Accordingly, LabCorp is due summary judgment on plaintiff's retaliation claims.

## RACE DISCRIMINATION CLAIMS

Plaintiff claims that LabCorp discriminated against her because of her race when it denied her request to transfer to a non-vacant service representative route. In such disparate treatment claims, plaintiff can only succeed if she proves that LabCorp acted with a discriminatory motive. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Under Title VII and 42 U.S.C. § 1981, a prima facie case of discrimination may be established with direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or by circumstantial evidence. *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555-56 (11th Cir. 1995). Because plaintiff has presented no direct or statistical evidence of discrimination, she must prove her case through circumstantial evidence.

In order to establish a prima facie case of discrimination using circumstantial evidence, a plaintiff must satisfy the test set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The three-step *McDonnell Douglas* analysis first requires a plaintiff to establish a prima facie case of discrimination based on a protected classification. *McDonnell Douglas*, 411 U.S. at 802. Under the second step, the defendant must articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. "The defendant need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "Once defendant states a legitimate reason, plaintiff must show that defendant's articulated reason is merely a pretext and that defendant's true reason [for its actions] was discrimination." *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or <u>indirectly by showing that the employer's proffered explanation is unworthy of credence.</u>" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)(citations omitted and alteration and emphasis in original), *cert. denied*, ___ U.S. ___, 118 S. Ct. 685 (1998). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. B. P. Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994).

To establish a prima facie case of race discrimination, plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the position that she held; (3) she experienced an adverse employment action; and (4) a similarly situated person outside of the

15

protected class was treated more favorably. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Plaintiff claims that LabCorp denied her request for reassignment to another service representative route because of her race. Because plaintiff has failed to provide sufficient evidence to meet her prima facie requirements for her race discrimination claim, summary judgment is appropriate.

Plaintiff is a member of a protected class, as she is an African-American female. Assuming that plaintiff was qualified for the position that she held LabCorp is still due summary judgment on this claim because the denial of the route transfer at issue does not rise to the level of an adverse employment condition since it involves no change in the terms, conditions, benefits or privileges of plaintiff's employment. According to plaintiff, regardless of the assigned route on the first shift, a service representative's duties remained the same. These duties included driving to various hospitals, clinics and physician offices, to pick up specimen and deliver supplies, which can weigh more than twenty pounds. (Pl.'s Dep. at 27-30). Also, a route change would not have increased plaintiff's pay or changed her work hours. (Hart Aff. ¶ 4). Furthermore, despite the denial of a route transfer, plaintiff still had access to a company car, the resources she needed to perform her duties, and her status, job responsibilities, and role at LabCorp remained the same. *See, e.g., Wanemaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2nd Cir. 1997) (*citing Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir. 1987)). Plaintiff simply cannot point to any expected change in the terms, conditions and privileges of her employment to substantiate her assertion that the denial of a route transfer was an adverse employment action. *See, e.g., Mungin v. Katten Muchen & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied

16

by a decrease in salary or work hour changes."); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir. 1981) ("[I]nterlocutory or mediate decisions having no effect upon employment . . . were not intended to fall within the direct proscriptions of Title VII."). LabCorp is due summary judgment on plaintiff's race discrimination claim since plaintiff cannot show that the denial of the route transfer resulted in an adverse employment action.

Furthermore, even if the court assumes that the denial of the transfer to an identical position was an adverse employment action and even if plaintiff can establish a prima facie case for LabCorp's refusal to transfer her to a non-vacant position, LabCorp is still due summary judgment. LabCorp has articulated a legitimate nondiscriminatory reason for the employment action taken. Defendant states that it simply does not allow full-time same shift route transfers. Instead, full-time employees are only transferred to other routes "when the route, itself, would change, depending on the needs of the clients, and if a route got too many stops, we would split it or add to another route, this type of thing. Those client needs would justify changing a route." (Trammell Dep. at 31-32). Plaintiff simply cannot point to any full-time employee who received a same shift route transfer because of their subjective perception that another route was easier.[8] Gary Sanderson, the only individual plaintiff can point to as the basis for her claim of disparate treatment, was a part-time employee and, as such, LabCorp asserts that his route assignment was

---

[8] Plaintiff asserts erroneously that Vann Shell, Jean Stacey, and Bill Stewart, all of whom are full-time employees, are proper comparators of her disparate treatment claim. However, none of these individuals received a same shift route transfer. Instead, Shell and Stacey changed shift, an option which plaintiff did not request and one she rejected when LabCorp offered it to her. (Pl.'s Dep. at 37-38, 152, 188). Similarly, Bill Stewart is not a proper comparator because he transferred to a different position, not to a different route. (Pl.'s Dep. at 169, 188; Trammel Dep. at 37) Furthermore, like Stewart, LabCorp granted plaintiff' request to transfer to a different position. (*Id.*).

17

easier to juggle than a full-time route. (Trammell Dep. at 41). Additionally, LabCorp asserts that Sanderson's transfer was temporary, unlike plaintiff's permanent request.[9]

To show that LabCorp's articulated reasons are a pretext for race discrimination, plaintiff attacks Trammell's testimony that it is easier to accommodate part-time employees by claiming that Trammell refused to transfer Glen Webster, a black employee, from full-time to part-time. Plaintiff presents no evidence to support her allegation that Trammell denied Webster a transfer. Furthermore, plaintiff has not presented any evidence that a part-time vacancy existed at the time of Webster's request, since Trammell testified that he granted transfer requests only when he had an opening. (Trammell Dep. at 31). Finally, the allegation that Trammell did not allow a full-time employee to work part-time hardly challenges Trammell's assertion that it is easier to juggle part-time routes when Webster was a full-time employee at the time Trammell denied his alleged request. Plaintiff simply cannot establish that LabCorp's reasons for not displacing one of her co-workers and reassigning her to another route are a pretext for unlawful discrimination. Accordingly, LabCorp is due summary judgment on plaintiff's race discrimination claim.

---

[9] In her brief, plaintiff contradicts her deposition testimony and asserts that her transfer request was also temporary. Further, she maintains that LabCorp knew this since LabCorp presented evidence to this court in its motion that her restrictions lasted only for two months. This argument ignores that until she submitted her brief opposing summary judgment, plaintiff maintained that she had an ADA disability - - a clear indication that she asserted that she had a non-temporary condition since the ADA does not cover temporary impairments. *See Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1328 (11th Cir. 1998); *Sanderson v. Arneson Products, Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996); *McDonald v. Commonwealth of Penn., Dept. Of Public Welfare*, 62 F.3d 92, 96 (3rd Cir. 1995); *Vande Zande v. Wisconsin Dept. Of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995). In fact, plaintiff continues to contradict herself since she asserts in her brief that she transferred to the Accessioning Department on March 24, 1994, because she could not lift more than twenty pounds. (Pl.'s Br. at 3). If her request was temporary, as she now maintains, she clearly had no need to transfer since her treating physician removed her lifting restrictions on February 21, 1994, well before the date she claims she transferred because she was unable to lift more than twenty pounds. (Pl.'s Dep. at 118-119, Def. Exh. 11).

## CONCLUSION

Based on the foregoing analysis, the court holds that there is no genuine issue as to any material fact and defendant is entitled to summary judgment as a matter of law. Accordingly, an order granting defendant's motion for summary judgment shall be entered contemporaneously herewith.

**DONE** this ___2nd___ day of March, 1999.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge